# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIN M. FEGAN, Individually and on behalf of all others similarly situated, | : : : | CIVIL ACTION NO. _____ |
| Plaintiff, | : : | CLASS ACTION |
| v. | : : | JURY TRIAL DEMANDED |
| McNEIL-PPC, INC., | : : : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Erin M. Fegan, on her own behalf and on behalf of all others similarly situated, alleges as follows, based on information and belief, except for allegations as to her own acts, which are made on personal knowledge:

## NATURE OF ACTION

1.      Plaintiff brings this civil antitrust class action on behalf of end-payors, i.e., the last persons and entities in the chain of distribution, who purchased Imodium Advanced other than for resale from October 2000 to at least the present (the "Class Period"). Defendant manufactures and sells Imodium Advanced, which is an over-the-counter product that contains both loperamide and simethicone to treat both diarrhea and the flatulence associated with diarrhea.

2.      This case arises out of Defendant's unlawful efforts to monopolize the U.S. market for over-the-counter drugs containing both loperamide and simethicone. In particular, Defendant unlawfully excluded generic competition from the market by obtaining patents for a drug containing both loperamide and simethicone by deceiving the Patent and Trademark Office

("PTO"), and by then filing a baseless patent infringement action against a competitor seeking to bring a generic version of the drug to market. In fact, after a bench trial, the United States District Court for the Eastern District of Pennsylvania determined that "during the prosecution of the patents in suit, McNeil's conduct was careless, irresponsible, and, at the very least, tantamount to studied and deceptive ignorance." <u>McNeil-PPC, Inc. v. L. Perrigo Company and Perrigo Company</u>, No. 01-1100, Opinion and Order (June 2002) (Schiller, J.). The Court also wrote that "[r]egrettably, I am constrained by law to award only counsel fees for [McNeil's] behavior, although I am not unmindful of the fact that while the patent litigation continues competition in the marketplace is foreclosed and the public is forced to pay higher prices."

## PARTIES

3. Plaintiff Erin M. Fegan is a resident of Cook County, Illinois. Plaintiff purchased Imodium Advanced for her personal use, and not for resale.

4. Defendant McNeil-PPC, Inc. is a corporation, which is a subsidiary of Johnson & Johnson, Inc. Defendant maintains its principal place of business in Fort Washington, Pennsylvania. Throughout the Class Period, Defendant manufactured, marketed, distributed, and sold substantial quantities of Imodium Advanced in a continuous flow of interstate trade and commerce, and Defendant's activities were within the flow of, and substantially affected, interstate trade and commerce.

## JURISDICTION AND VENUE

5. Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

6. Venue is proper under 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. § 22.

## CLASS ALLEGATIONS

7.      Plaintiff brings this action on behalf of him/herself and the following Class and Subclass:

> All persons and entities in the United States who, at any time from October 1, 2000 to at least the present or such later date when Defendant's conduct ceases affecting the market (the "Class Period"), purchased Imodium Advanced in the United States other than for re-sale (the "Nationwide End-Payor Class").

> All persons and entities in the United States who, at any time during the Class Period purchased Imodium Advanced in the District of Columbia, Arizona, California, Florida, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New Jersey, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia or Wisconsin other than for re-sale (the "23-Jurisdiction End-Payor Subclass").

Excluded from the Class and Subclass are Defendants, their subsidiaries and affiliates, and government entities.

8.      Common questions of law and fact exist as to all members of the Class and Subclass.  Among those questions are the following:

   a. Whether Defendant unlawfully monopolized the U.S. Market for drug products containing both loperamide and simethicone;

   b. Whether Plaintiff and members of the Class and Subclass are entitled to declaratory and injunctive relief;

   c. Whether Defendant's unlawful conduct caused Plaintiff and the other Class and Subclass members to pay more for products containing both loperamide and simethicone than they otherwise would have paid;

   d. The appropriate measure of the Class's and Subclass's damages.

9.      These and other questions of law and fact are common to the members of the Class and Subclass and predominate over any questions affecting only individual members.

Plaintiff's claims are typical of the claims of other members of the Class and Subclass because Plaintiff and all Class and Subclass members sustained damages in the same way, as a result of Defendants' wrongful conduct as alleged in this Complaint and all claims for each Class and Subclass arise out of the same nucleus of operative facts and are based on the same legal theories.

10. Plaintiff will fairly and adequately protect the interest of the other Class and Subclass members. Plaintiff has retained counsel who are experienced in class action and antitrust litigation, and Plaintiff has no interest in this litigation that is adverse to or in conflict with the interest of the other members of the Class and Subclass.

11. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many members of the Class and Subclass, including Plaintiff, are expected to be relatively small, so that the expense and burden of prosecuting an antitrust damages case such as this one will almost certainly preclude individual litigation by such members. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that will preclude its maintenance as a class action.

12. Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and the Subclass as a whole.

## RELEVANT MARKET

13. The relevant market for Plaintiff's claims is the market for over-the-counter products containing both loperamide and simethicone. The relevant geographic market is the United States. During the Class Period, Defendant possessed 100% of the market.

## FACTS

### A. Federal Regulation of Prescription Drugs

#### 1. New Drug Applications

14. The statute regulating the manufacture and distribution of drugs and medical devices in the United States is the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FD&C Act").  Under the FD&C Act, approval by the FDA, the governmental body charged with regulation of the pharmaceutical industry, is required before a company may begin selling a new drug in interstate commerce in the United States.  21 U.S.C. § 355(a).  Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FD&C Act demonstrating that the drug is safe and effective for its intended use.

15. New drugs that are approved for sale in the United States by the FDA are typically covered by patents, which provide the patent owner with the right to exclude others from making, using or selling that new drug in the United States for the duration of the patents, plus any extension of the original patent period granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("Hatch-Waxman Act").

16. Pursuant to 21 U.S.C. § 355(b), in its NDA, the pioneer drug manufacturer must list all patents that claim the drug for which FDA approval is being sought, or that claim a method of using the drug, and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug.

17. Once the NDA is approved, any claimed patents are listed with the NDA in a publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations.  This publication is commonly called the "Orange Book."

18.     Pursuant to 21 U.S. C. § 355(c)(2), if, after its NDA is approved, the pioneer drug manufacturer is issued a new patent that claims the drug or methods of its use, the company must supplement its NDA by listing such new patent within 30 days of issuance, whereupon the FDA publishes the new patent in a supplement to the Orange Book.  The FDA is required to accept as true patent information it obtains from patent holders, such as whether a patent covers a particular drug product.  If an unscrupulous patent holder is willing to provide false information to the FDA to delay the onset of generic competition, the FDA is powerless to stop it.

**2.     Generic Drugs**

19.     Generic drugs are drugs that the FDA has found to be bioequivalent to their corresponding brand-name drug.  A generic drug provides the identical therapeutic benefits as its brand-name counterpart.

20.     Generic drugs are invariably priced substantially below the branded drugs to which they are bioequivalent.  Typically, the first generic drug is sold at a substantial discount to the brand name drug, followed by steeper discounts as more companies begin selling the generic. The beneficiaries of this competition are the consumers and third-party payors who pay the retail price of drugs sold by pharmacies.

21.     The branded drug generally loses substantial sales to generic within a relatively short time, primarily as a result of cross-overs to generics by consumers.

**3.     Abbreviated New Drug Applications ("ANDAs") For Generic Drugs**

22.     Under the Hatch-Waxman Act, a generic drug manufacturer may seek expedited FDA approval to market a generic version of a brand-name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA") pursuant to 21 U.S.C. § 355(j).  An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the

brand-name drug. One of Congress's central goals in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." Nova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

23. The Hatch-Waxman Act permits ANDA applicants to perform all necessary testing, submit an application for approval, and receive tentative approval before the relevant patents expire. Thus, assuming approval, generic versions of patented drugs can be marketed immediately following patent expiration. Prior to the Hatch-Waxman Act, a generic applicant had to wait until all patents had expired prior to beginning the approval process or otherwise face an infringement suit.

24. For each patent applicable to a pioneer drug listed in the Orange Book, an ANDA applicant must certify whether a proposed generic drug infringes that patent. An ANDA applicant must certify either that: (i) the required patent information has not been filed; (ii) the patent has expired; (iii) the patent has not expired but will expire on a particular date; or (iv) the patent is invalid or will not be infringed by the drug for which the applicant seeks approval ("Paragraph IV Certification"). See 21 U.S.C. § 355(j)(2)(A)(vii).

25. Under the Hatch-Waxman Act, within 45 days from receipt of notification of a Paragraph IV Certification, the pioneer drug owner can bring a patent infringement suit against the ANDA applicant. If the pioneer drug owner commences an infringement suit during this period, FDA final approval of the ANDA is automatically stayed until the earliest of: (i) the expiration of the patent; (ii) the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification; or (iii) a final judicial determination of non-infringement or patent invalidity. If no infringement action is filed, the FDA approval process is not delayed.

26.    The first ANDA filer also has an advantage over any subsequent ANDA filers in that the first to file is eligible for a 180-day period during which it can market its generic version on an exclusive basis. 21 U.S.C. § 355(j)(5)(B)(iii). The exclusivity period runs from either the first filer's commencement of the marketing of its generic drug or from the date of a court decision determining that a patent at issue in an infringement action is either invalid or not infringed. See 21 U.S.C. § 355(j)(5)(B)(V).

27.    If any patent infringement lawsuit commenced by a pioneer drug company against an ANDA filer is still ongoing after 30 months, the FDA can grant final marketing approval to the first filed ANDA applicant. Thereafter, an ANDA applicant with FDA approval may market its generic product in the United States even if the patent infringement lawsuit remains unresolved. Prior to the expiration of the 30-month period, the FDA may grant "tentative" approval of an ANDA once it determines that all the criteria for "final" approval have been satisfied, subject to the resolution of patent issues and the 180-day exclusivity period.

## DEFENDANTS' UNLAWFUL CONDUCT

29.    Loperamide is a non-addictive opiate used to treat diarrhea. In March 1988, Defendant began selling loperamide as an over the counter drug, under the brand name Imodium AD.

30.    Because the patents for loperamide were expiring, Defendant directed Dr. Jeffrey Garwin, one of its researchers, to develop a new form of loperamide to patent. Dr. Garwin combined loperamide with simethicone. Simethicone is used as an anti-flatulent.

31.    The PTO issued two patents covering a loperamide-simethicone product as a result of patent applications based on Dr. Garwin's work. The first patent was issued on September 28, 1993 and the second patent was issued on March 18, 1997.

32. Additional patent applications, based on the work of Dr. Charles Stevens and other of Defendant's personnel, resulted in applications to the PTO for, and the PTO's issuance of, two additional patents relating to the loperamide-simethicone product.

33. Defendant marketed the combination of loperamide and simethicone as "Imodium Advanced." The packaging for Imodium Advanced states that it "controls the symptoms of diarrhea plus bloating, pressure, and cramps commonly referred to as gas." A similar statement appears as a description of the product's "use" on the back label.

34. L. Perrigo Company and Perrigo Company ("Perrigo") compete with name brand manufacturers by manufacturing generic versions of drugs. In November 2000, Perrigo filed an ANDA seeking approval to market a loperamide-simethicone product in competition with Defendant. Perrigo sent Defendant a Paragraph IV Certification that Perrigo's drug did not infringe on Defendant's patents and that Defendant's patents were invalid.

35. On March 7, 2001, Defendant filed an action against Perrigo, alleging that Perrigo's loperamide-simehticone product infringed Defendant's patents.

36. In June 2002, following a bench trial of Defendant's allegations, in which Defendant had a full and fair opportunity to litigate its claims, the District Court issued findings of fact and conclusions of law invalidating Defendant's patents. The Court found that Defendant had made misrepresentations to the PTO, failed to disclose relevant prior art, and prosecuted the patents for a loperamide-simethicone produce even though the combination of the two was "exceedingly obvious."

37. Nevertheless, Defendant not only sought to obtain patents covering a loperamide-simethicone combination, it manipulated the Orange Book by causing its patents to be filed there and then filed baseless litigation seeking to enforce the patents it convinced the PTO to issue. In

9

awarding attorneys' fees to Perrigo, the District Court concluded, based on clear and convincing evidence, that Defendant's case was an "exceptional" one, noting that "[e]xceptional cases are normally those cases involving bad faith litigation or misconduct by the patentee in procuring the patent." The Court wrote that:

> Particularly during the prosecution of the patents in suit, McNeil's conduct was careless, irresponsible, and, at the very least, tantamount to studied and deceptive ignorance. McNeil's repeated erroneous representations, failure to disclose relevant prior art, and overall persistence is prosecuting exceedingly obvious 'inventions' make this case exceptional.
>
> Although McNeil's misconduct during the prosecution alone makes this case exceptional, there is further evidence warranting an award of attorneys' fees. … [T]he Garwin and Stevens patents amount to a scheme for extending the life of a drug about to go off patent, and McNeil executed this scheme without the slightest regard for the intent and purposes of the patent laws. Indeed, McNeil's sole motive was to compromise these statutes and constitutional protections for the sake of profits.

***

> It is not lost on the court that by developing ('not inventing') a combination drug, the law automatically permitted McNeil a three-year period of exclusivity … However, by concocting multiple patent applications and litigating their validity, this period of exclusivity has been extended for two years and, with an appeal, will extend even further, effectively doubling the initial period of exclusivity. The business-driven decision that it is worth the investment to 'invent an invention' will continue unabated unless a vigorous PTO or a Court sees this transparent attempt to subvert the patent laws for what it is. The patent laws are not the private sandbox of pharmaceutical companies. …

## **MARKET EFFECTS**

38. Defendant's acts and practices, as alleged in this Complaint, have had the purpose and effect of restraining competition unreasonably and injuring competition by preventing the entry of generic competition into the relevant market. Defendant's exclusionary conduct has unlawfully protected Imodium Advanced from generic competition from at least October 2000 through at least the present.

39. If a generic competitor had been able to enter the relevant market and compete with Defendant, end-payors such as Plaintiff would have been free to substitute a lower-priced generic for the higher-priced brand name drug.

40. By preventing generic competition from entering the market, Defendant has injured Plaintiff and the other members of the Class and Subclass in their business or property by causing them to pay more than they otherwise would have paid. Defendant's unlawful conduct has deprived Plaintiff and the other end-payors of the benefits of the competition that the federal and state antitrust laws were designed to preserve.

## COUNT I

### (On Behalf of the Nationwide End-Payor Class for Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violation of Section 2 of the Sherman Act)

41. Plaintiff incorporates by reference the preceding allegations.

42. As described above, Defendant knowingly and willfully engaged in a course of conduct designed to monopolize the market for products containing both loperamide and simethicone. The result of Defendant's unlawful conduct has been to obtain and extend its monopoly.

43. At all relevant times, Defendant has created and maintained monopoly power in the relevant market.

44. Defendant intentionally and wrongfully created, maintained, and abused monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

45. Plaintiff and the other members of the Nationwide End-Payor Class have been injured in their business or property by reason of Defendant's antitrust violation alleged in this

Count.  Their injuries consist of paying higher prices than they would have paid in the absence of that violation.  Their injuries are of the type the antitrust laws were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## COUNT II

### (On Behalf of the 23 Jurisdiction End-Payor Subclass for Monopolization Under State Law)

46. Plaintiff incorporates by reference the preceding allegations.

47. As described above, Defendant knowingly and willfully engaged in a course of conduct designed to obtain and extend monopoly power.

48. At all relevant times, Defendant has maintained monopoly power in the relevant market.

49. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Arizona Revised Stat. §§ 44-1401, et seq., with respect to purchases of Imodium Advanced in Arizona by members of the 23 Jurisdiction End-Payor Subclass.

50. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases of Imodium Advanced in California by members of the 23 Jurisdiction End-Payor Subclass.

51. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-4502, et seq., with respect to purchases of Imodium Advanced in the District of Columbia by members of the 23 Jurisdiction End-Payor Subclass.

52. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Fla. Stat. §§ 501.201, et seq., with respect to purchases of Imodium Advanced in Florida by members of the 23 Jurisdiction End-Payor Subclass.

53. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Iowa Code §§ 553, et seq., with respect to the purchases of Imodium Advanced in Iowa by members of the 23 Jurisdiction End-Payor Subclass.

54. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Kan. Stat. Ann. §§ 50-101, et seq., with respect to purchases of Imodium Advanced in Kansas by members of the 23 Jurisdiction End-Payor Subclass.

55. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of La. Rev. Stat. §§ 51:137, et seq., with respect to purchases of Imodium Advanced in Louisiana by members of the 23 Jurisdiction End-Payor Subclass.

56. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to purchase of Imodium Advanced in Maine by members of the 23 Jurisdiction End-Payor Subclass.

57. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Mass. Ann. Laws Ch. 93A, et seq., with respect to purchases of Imodium Advanced in Massachusetts, members of the 23 Jurisdiction End-Payor Subclass.

58. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases of Imodium Advanced in Michigan by members of the 23 Jurisdiction End-Payor Subclass.

59. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.49, et seq., with respect to purchases of Imodium Advanced in Minnesota by members of the 23 Jurisdiction End-Payor Subclass.

60. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Miss. Stat. §§ 75-21-1, et seq., with respect to purchases of Imodium Advanced in Mississippi by members of the 23 Jurisdiction End-Payor Subclass.

61. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. § 598A, et seq., with respect to purchases of Imodium Advanced in Nevada by members of the 23 Jurisdiction End-Payor Subclass.

62. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market, and their conduct constitutes an unfair trade practice and unconscionable commercial practice in violation of N.J. Stat. Ann. §§ 56:8-1, et seq., with respect to purchases of Imodium Advanced in New Jersey by members of the 23 Jurisdiction End-Payor Subclass.

63. Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to

purchases of Imodium Advanced in New Mexico members of the 23 Jurisdiction End-Payor Subclass.

64.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of N.Y. General Business Law § 340, et seq., with respect to purchases of Imodium Advanced in New York by members of the 23 Jurisdiction End-Payor Subclass.

65.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases of Imodium Advanced in North Carolina by members of the 23 Jurisdiction End-Payor Subclass.

66.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to purchases of Imodium Advanced in North Dakota by members of the 23 Jurisdiction End-Payor Subclass.

67.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to purchases of Imodium Advanced in South Dakota by members of the 23 Jurisdiction End-Payor Subclass.

68.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases of Imodium Advanced in Tennessee by members of the 23 Jurisdiction End-Payor Subclass.

69.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to purchases of Imodium Advanced in Vermont by members of the 23 Jurisdiction End-Payor Subclass.

70.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to purchases of Imodium Advanced in West Virginia members of the 23 Jurisdiction End-Payor Subclass.

71.     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Wis. Stat. § 133.01, et seq., with respect to purchases of Imodium Advanced in Wisconsin by members of the 23 Jurisdiction End-Payor Subclass.

72.     Members of the 23 Jurisdiction End-Payor Subclass have been injured in their business or property by reason of Defendant's antitrust violation alleged in this Count. Their injury consists of paying higher prices for Imodium Advanced than they would have paid in the absence of those violations. Their injury is of the type the antitrust laws of the above States and the District of Columbia were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## COUNT III

### (On Behalf of the Nationwide End-Payor Class for Unjust Enrichment Under State Law)

73.     Plaintiff incorporates by reference the preceding allegations.

74.     Defendant has benefited from their unlawful acts through the overpayments for Imodium Advanced by Plaintiff and the other members of the Nationwide End-Payor Class. It

would be inequitable for Defendant to be permitted to retain any of the Plaintiff's and the Nationwide End-Payor Class's resulting overpayments for Imodium Advanced.

75. Plaintiff and the Nationwide End-Payor Class are entitled to the establishment of a constructive trust consisting of all overcharges from which Plaintiff and the other class members may make claims on a pro rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant for the following relief:

1. A declaration that Defendant has committed the violations alleged herein;

2. A judgment for the damages sustained by Plaintiff and the Class and Subclass defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law including treble damages;

3. Disgorgement of Defendant's unjust enrichment;

4. The costs of this suit, including a reasonable attorneys' fee; and

5. Such other and further relief as the Court deems just and proper.

**JURY DEMANDED**

Plaintiff demands a trial by jury of all issues so triable.

                **TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By: _____
    Kenneth I. Trujillo (I.D. No. 46520)
    Ira Neil Richards (I.D. No. 50879)
    Peter D. Winebrake (I.D. No. 80496)
    The Penthouse
    226 W. Rittenhouse Square
    Philadelphia, PA 19103
    (215) 731-9004
    (215) 731-9044 Fax

Kenneth A. Wexler
KENNETH A. WEXLER AND ASSOCIATES
One North LaSalle
Suite 2000
Chicago, Illinois 60602
(312) 346-2222

Date: July 9, 2002      **ATTORNEYS FOR PLAINTIFF AND THE CLASS**